UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

KEVIN REID,                          )
                                     )
        Petitioner,                  )    CASE NO. 2:07-cv-01409-RSL-JLW
                                     )
        v.                           )
                                     )
D.K. SISTO, Warden,                  )    REPORT AND RECOMMENDATION
                                     )
        Respondent.                  )
_____     )

I.      SUMMARY

        Petitioner Kevin Reid is currently incarcerated at the California State Prison, Solano in
Vacaville, California.  He pled guilty to second degree murder with a weapon enhancement in
Contra Costa County Superior Court on September 16, 1981, and was sentenced to 16-years-
to-life with the possibility of parole.  He has filed a petition for writ of habeas corpus, together
with relevant portions of the state court record, under 28 U.S.C. § 2254.  (*See* Docket 1.)
Petitioner challenges Governor Schwarzenegger's 2005 decision finding him unsuitable for
parole, and reversing his November 2004 grant of parole by the Board of Parole Hearings of
the State of California (the "Board"),[1] on the grounds that the Governor's parole denial
violated his federal due process rights.  (*See id*. at 10-13.)

_____

    [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on
July 1, 2005.  *See* California Penal Code § 5075(a).

01     Respondent has filed an answer to the petition in which he contends that the Court

02 should dismiss the petition because it was untimely under the one-year statute of limitations

03 set forth in the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). (*See*

04 Dkt. 12 at 5-9.) In the alternative, respondent asserts that petitioner's claims are without

05 merit. (*See id*. at 10-17.) Petitioner filed a traverse in reply to the answer in which he denies

06 respondent's contentions. (*See* Dkt. 15.)

07     In addition, this Court directed respondent to supplement the record with briefing and

08 portions of petitioner's institutional record that support the Governor's findings regarding

09 petitioner's disciplinary history in prison and "documented history of inappropriately

10 managing his anger," in the event that the information contained therein would assist this

11 Court in evaluating petitioner's due process claim. (*See* Dkt. 18.) Respondent produced the

12 requested supplemental briefing and related exhibits, and petitioner filed a supplemental brief

13 in response. (*See* Dkts. 21 and 22.) Respondent also argues, however, that this Court is

14 barred from considering these documents because petitioner failed to attach them to his state

15 habeas petition and they were therefore not part of the state court record. (S*ee* Dkt. 21 at 2.)

16 Because the only authority cited by respondent in support of his contention is 28 U.S.C.

17 § 2254(e)(2), which relates to a federal court's ability to hold an evidentiary hearing rather

18 than expand the record, his argument is unconvincing. (*See id*.) Pursuant to Rule 7(a), a

19 federal habeas court may expand the record to include additional materials relating to the

20 petition. *See* Rule 7(a), Rules Governing § 2254 Cases. Accordingly, I recommend the Court

21 reject respondent's contention and review respondent's supplemental filing.

22

01       In their supplemental briefing, respondent and petitioner requested that this case be

02   stayed pending the resolution of *Hayward v. Marshall*, a case argued and submitted on June

03   24, 2008, before a limited en banc panel in the U.S. Court of Appeals for the Ninth Circuit.

04   512 F.3d 536 (9th Cir. 2008), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008).  (*See* Dkt.

05   21 at 5; Dkt 22 at 2.)  *Hayward* presents issues sufficiently similar to those in this case that it

06   seems likely the en banc decision will have significant implications for the resolution of

07   petitioner's case.  Presuming that a decision in *Hayward* would be forthcoming in a

08   reasonable period of time, this Court entered an Order deferring submission of this Report and

09   Recommendation until the filing of the Ninth Circuit's en banc decision.  (*See* Dkt. 23.)  As of

10   the date of this Report and Recommendation, however, *Hayward* remains undecided.

11   Petitioner has therefore waited approximately thirty-two months for the District Court to

12   address his claims.  Fairness to the parties requires that this Court move ahead.  If *Hayward* is

13   decided while this Report and Recommendation is pending before the presiding U.S. District

14   Judge, he will be able to take that decision into account in ruling upon this case.

15       The Court, having thoroughly considered the record and briefing of the parties,

16   recommends that the Court find that petitioner's federal habeas petition is untimely, which is

17   a fully sufficient basis for denial.  But even if petitioner attempts to make, and if this Court

18   permits him to make, a belated showing that his petition is timely, his petition must fail on the

19   merits.  Under either basis, this action should be dismissed with prejudice.

20       II.     TIMELINESS

21       Like most California prisoners, petitioner used the state's original writ system to

22   present a collateral challenge to his confinement.  "The supreme court, intermediate courts of

appeal, and superior courts all have original habeas corpus jurisdiction." *Nino v. Galaza,* 183 F.3d 1003, 1006 n.2 (9th Cir. 1999); Cal. Const. art. VI, § 10. As a result, "California's collateral review system differs from that of other States in that it . . . contemplates that a prisoner will file a new 'original' habeas petition" in each court. *Carey v. Saffold*, 536 U.S. 214, 220-21 (2002). Petitioner filed original habeas petitions in the Superior Court for Contra Costa County; in the California Court of Appeals; and in the California Supreme Court. (*See* Dkt. 12, Exs. E, F, and G.) For simplicity, the analysis which follows will refer to these petitions as State Petitions #1, #2 and #3, respectively.

AEDPA provides that a state prisoner has one year to seek federal habeas corpus relief. *See* 28 U.S.C. § 2244(d)(1). Federal courts apply several ground rules in determining what time intervals "count" against this one-year limitations period. Where a petition challenges the denial of parole, the entire period between the date when the factual predicate of the claim could have been discovered through the exercise of due diligence, until the date of filing of the first state habeas petition, is counted. *See id.* § 2244(d)(1)(D); *Redd v. McGrath*, 343 F.3d 1077, 1079 (9th Cir. 2003). If a California petitioner files a series of state petitions, the period between the denial of one and the filing of the next is not counted at all if the delay is "reasonable;" but that interval is counted in full if the delay is "unreasonable." *See Evans v. Chavis*, 546 U.S. 189, 197-98 (2006). Once the final state petition is denied, the entire interval between the denial of that petition and the filing of the federal petition is counted. *See Galaza*, 183 F.3d at 1006; *Roy v. Lampert*, 465 F.3d 964, 968 (9th Cir. 2006). These various intervals are cumulated or "tacked" to determine whether a petitioner has complied with the AEDPA one-year limitations period.

01    The relevant time intervals in this case are illustrated in the following chart:

02              Petitioner Received Notice of Governor's Denial of Parole

03                              262 Days

04                  State Petition #1 Filed, Later Denied

05                              155 Days

06                  State Petition #2 Filed, Later Denied

07                      49 days - Reasonable Period

08                  State Petition #3 Filed, Later Denied

09                              61 Days

10                      Federal Petition Filed

11    As indicated, 262 days elapsed before the filing of State Petition #1. 155 days elapsed

12 between the denial of State Petition #1 and the filing of State Petition #2, but the

13 reasonableness of this delay is at issue. Respondent acknowledges the 49-day interval

14 between the denial of State Petition #2 and the filing of State Petition #3, but does not argue

15 that this interval was "unreasonable." (*See* Dkt. 12 at 9.) Finally, the interval between the

16 denial of State Petition #3 and the filing of this federal habeas petition was 61 days.

17    The parties in this case disagree regarding the timeliness of petitioner's federal habeas

18 petition. (*See* Dkt. 12 at 5-9; Dkt. 15 at 2-6.) Their first point of disagreement concerns the

19 date on which AEDPA's one-year statute of limitations began to run against petitioner

20 because the factual predicate of petitioner's claim could have been discovered through the

21 exercise of due diligence. (*See* Dkt. 12 at 2; Dkt. 15 at 2.) Specifically, respondent argues

22 that because petitioner received a letter informing him of Governor Schwarzenegger's parole

denial dated March 30, 2005, together with a copy of the Governor's decision, the statute of

limitations began to run the next day, March 31, 2005. (*See* Dkt. 12 at 2.) In contrast,

petitioner contends that AEDPA's one-year statute of limitations did not begin to run until

April 12, 2005, because the Governor's letter and decision were not actually faxed to CSP-

Solano, where petitioner was incarcerated, until 1:51 p.m. on April 11, 2005, as demonstrated

by the fax date noted on the header of the Governor's letter. (*See* Dkt. 15 at 1-2; Dkt. 12,

Exhibit D at 1.) Because the Court finds that "due diligence" does not require petitioner to

have discovered the Governor's parole denial before he received a copy of the Governor's

letter and decision reversing the Board's grant of parole, and petitioner's assertion regarding

the actual date these documents were faxed to petitioner's institution appears accurate, this

Court agrees with petitioner that the one-year statute of limitations began to run on April 12,

2005. *See also Evins v. Curry*, 2009 WL 649788, *1 (N.D. Cal. 2009) (finding that AEDPA's

statute of limitations began to run after "[p]etitioner received the Governor's decision to

reverse the Board's grant of parole.").

Starting April 12, 2005, a total of 262 days elapsed before petitioner filed State

Petition #1 on December 29, 2005. (*See* Dkt. 1, Ex. 3; Dkt. 12, Ex. E.)

It is undisputed that the interval between the denial of State Petition #1 and the filing

of State Petition #2 was 155 days. (*See* Dkt. 1, Ex. 3 and 4; Dkt. 12, Ex. E at 1-6 and F; Dkt.

15 at 5.) Respondent contends this was an unreasonable delay (s*ee* Dkt. 12 at 8-9; *id*. Exs. E,

F, and G), and as a result this interval must be counted against the one-year limitations period.

To date, the California Supreme Court has not provided any guidance as to what

constitutes an unreasonable delay in filing a subsequent habeas petition under California law.

*See King v. LaMarque*, 464 F.3d 963, 966 (9th Cir. 2006). Furthermore, when the Ninth Circuit Court of Appeals certified several "questions of law concerning the timeliness of a California's inmate's petition for writ of habeas corpus" to the California Supreme Court in *Chaffer v. Prosper*, the state court denied certification. 542 F.3d 662, 663-66 (9th Cir. 2008).

The U.S. Supreme Court held in *Evans v. Chavis* that until the California Supreme Court indicates otherwise, federal courts must operate "on the assumption that California law . . . [does] not differ significantly from the laws of other States, i.e., that California's 'reasonable time' standard [does] not lead to filing delays substantially longer than those in States with determinate timeliness rules." 546 U.S. at 199-200 (citing *Saffold*, 536 U.S. at 222-23). Thus, "an unjustified or unexplained" delay in filing that is substantially longer than the "shorter period[s] of time, 30 to 60 days, that most States provide for filing an appeal to the state supreme court" is "unreasonable" under California law. *Id.* at 201.

In addition, after the California Supreme Court denied certification in *Chaffer*, the Ninth Circuit held that the prisoner was not entitled to statutory tolling of the limitations period for the 115-day gap between the denial of his first state habeas petition in the superior court and the filing of his second in the California Court of Appeal, as well as for the 101-day gap between the denial of his second state habeas petition and the filing of his third in the California Supreme Court. 592 F.3d 1046, 1048 (per curiam). Specifically, the *Chaffer* court held that the prisoner's filing delays of 115 and 101 days were substantially longer than the "30 to 60 days" that most states allow, and "unexplained delays of this magnitude [did not] fall within the scope of the federal statutory word 'pending' [in 28 U.S.C. § 2244(d)(2).]" *Id.* (citing *Chavis*, 546 U.S. at 201.)

01    Although petitioner argues that the *Chavis* decision is inapplicable to his federal

02 petition under *Teague v. Lane*, because *Chavis* announced a new "30-60 day rule" which does

03 not apply retroactively on collateral review, his contention lacks merit.  (*See* Dkt. 15 at 2-3.)

04 Under *Teague*, "a case announces a new rule when it breaks new ground or imposes a new

05 obligation on the States or the Federal Government."  *Teague v. Lane,* 489 U.S. 288, 301

06 (1989).  Put another way, "a case announces a new rule if the result was not *dictated* by

07 precedent existing at the time the defendant's conviction became final."  *Id.*; *Whorton v.*

08 *Bockting*, 549 U.S. 406, 416 (2007).  Contrary to petitioner's contention, however, *Chavis* did

09 not announce a "new rule" within the meaning of *Teague*.  Rather, *Chavis* applied the

10 principles previously set forth in *Carey v. Saffold*, and asserted that the California Supreme

11 Court "remains free to tell us if . . . we were wrong" about what constitutes a "reasonable"

12 delay under California's indeterminate timeliness rule.  *See Chavis*, 546 U.S. at 199-200.

13 Accordingly, *Chavis* applies to the instant petition.

14    Here, petitioner's 155-day delay between the denial of State Petition #1 and the filing

15 of State Petition #2 was substantially longer than the "shorter period[s] of time, 30 to 60 days,

16 that most States provide for filing an appeal to the state supreme court."  *Id.* at 201.

17 Moreover, 155 days is substantially longer than the delays of 115 and 101 days which the

18 Ninth Circuit held to be "unreasonable" in *Chaffer*.  *See Chaffer*, 592 F.3d at 1048.

19 Accordingly, petitioner's 155-day delay is "unreasonable" under California law.

20    In his traverse, petitioner also asserts several reasons to justify or explain his 155-day

21 delay in filing State Petition #2, although he does not specify whether he believes these

22 reasons entitle him to either statutory tolling or equitable tolling of the statute of limitations.

01 (*See* Dkt. 15 at 5-6.)[2]  For the reasons discussed below, this Court finds that petitioner is not

02 entitled to tolling under either standard.

03          In order to justify statutory tolling, it appears that a petitioner must provide a sufficient

04 justification for the unreasonable filing delay based upon unique facts pertaining to that

05 petitioner's case.  As discussed above, the U.S. Supreme Court held in *Chavis* "that California

06 would [not] consider an *unjustified* or *unexplained* 6-month filing delay 'reasonable.'"

07 *Chavis*, 546 U.S. at 201 (emphasis added).  In addition, the Ninth Circuit held in *Waldrip v.*

08 *Hall* that a petitioner was not entitled to statutory tolling under *Chavis* "absent sufficient

09 justification [for his substantial filing delay] based on unique facts pertaining to the individual

10 petitioner. . . ."  548 F.3d 729, 731 (9th Cir. 2008).  Specifically, the *Hall* court considered the

11 petitioner's "attempts to explain or justify the delay in his state court filing," but ultimately

12 rejected each of the petitioner's proffered reasons as unpersuasive.  *Id*. at 736-37.  *See also*

13 *Chaffer*, 592 F.3d at 1048 (holding that a petitioner was not entitled to statutory tolling for

14 filing delays substantially longer than 30-60 days where his "petitions offered no justification

15 for the delays as required under California law. . . ."); *Gaston v. Palmer*, 447 F.3d 1165, 1167

16 (9th Cir. 2006) (holding that a petitioner was not entitled to statutory tolling, "given the lack

17 of explanation or justification for [petitioner's] delays" of ten, fifteen, and eighteen months,

18 where the court had previously rejected petitioner's contention that his filing delays were

19 caused by his disabilities and lack of access to legal materials).

20 _____

21          [2] Petitioner also attempts to justify or explain his delay in filing State Petition #1 in the Contra
Costa County Superior Court.  Specifically, he asserts that the paralegal who was helping him draft his
petition suffered a fatal heart attack, requiring him to locate a second paralegal to assist him.  (*See id.*

22 at 5.)  Although these circumstances are very unfortunate, they do not explain petitioner's 155-day
delay in filing State Petition #2, which is the delay at issue here.

Furthermore, the doctrine of equitable tolling is only available if "extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time." *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002). The threshold "is very high, lest the exceptions swallow the rule." *Id*. Specifically, a petitioner bears the heavy burden of showing "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way," preventing a timely filing. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Finally, "[w]here a prisoner fails to show 'any causal connection' between the grounds upon which he asserts a right to equitable tolling and his inability to file a timely federal habeas application, the equitable tolling claim will be denied." *Gaston v. Palmer*, 417 F.3d 1030, 1034-35 (9th Cir. 2005), *amended,* 447 F.3d 1165 (9th Cir. 2006).

First, petitioner cites his lack of formal legal education or training as a reason for his delay. (*See* Dkt. 15 at 5.) It is well-established, however, that a prisoner's lack of legal sophistication or pro se status is not sufficient to justify tolling of the statute of limitations. *See Lampert*, 465 F.3d at 970; *Raspberry v. Garcia,* 448 F.3d 1150, 1154 (9th Cir. 2006). Petitioner does not present any reason why this Court should depart from this rule.

Petitioner next asserts that he corresponded with an attorney regarding his petition for "about six weeks," but the attorney ultimately advised petitioner to continue representing himself in the California Court of Appeal and California Supreme Court. (*See* Dkt. 15 at 6.) Because there is no right to assistance of counsel during state habeas proceedings, however, the attorney's decision not to represent petitioner did not constitute an "extraordinary circumstance" which prevented petitioner from timely filing his petition. *See Coleman v. Thompson*, 501 U.S. 722, 755 (1991); *Jeffers v. Lewis*, 68 F.3d 299, 300 (9th Cir. 1995).

01 Even if an attorney-client relationship had been established, negligence by the attorney would

02 not have excused petitioner's unreasonable delay in filing his petition with the California

03 Court of Appeal.  *See Hall*, 548 F.3d at 737 (holding that negligence by petitioner's counsel

04 did not excuse petitioner's filing delay or entitle him to statutory tolling); *Frye v. Hickman*,

05 273 F.3d 1144, 1146 (9th Cir. 2001) (holding that attorney negligence in failing to timely file

06 a habeas petition generally does not justify equitable tolling).  Similarly, the fact that

07 petitioner later located a prison paralegal who helped prepare and file his petition " 'does not

08 relieve [petitioner] from the personal responsibility of complying with the law.' "  *Chaffer*,

09 592 F.3d at 1049 (quoting *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000).

10       Finally, petitioner alleges that an institutional lockdown in May 2006 "further

11 slow[ed] progress on petitioner's research and preparation of the petition," and the "[r]eceipt

12 of mail is frequently delayed at petitioner's institution."  (Dkt. 15 at 6.)  Both of these

13 circumstances "are hardly extraordinary given the vicissitudes of prison life, and there is no

14 indication in the record that they made it 'impossible' for him to file on time." *Id.* (citing

15 *Ramirez v. Yates*, 571 F.3d 993, 997 (9th Cir. 2009)).  Specifically, federal courts have

16 consistently found that lockdowns and the resulting restricted access to the prison law library

17 are concerns shared by virtually all state prisoners.  *See Hall*, 548 F.3d at 737 (holding that a

18 prison lockdown prohibiting access to the law library did not explain or justify the petitioner's

19 filing delay, or entitle him to statutory tolling); *Rosati v. Kernan*, 417 F.Supp.2d 1128, 1132

20 (C.D. Cal. 2006) ("limited access to the law library and . . . occasional prison lockdowns do

21 not warrant equitable tolling since petitioner has not shown any causal connection between

22 these events and his failure to timely file his habeas corpus petition.").  In addition, petitioner

01 has failed to show "any causal connection" between the alleged delays in mail-room

02 processing at CSP-Solano and his inability to file his petition on time. *See Gaston*, 417 F.3d

03 at 1034-35. For example, petitioner does not allege that he failed to receive timely notice that

04 the superior court had denied his prior petition. *See Ramirez*, 571 F.3d at 997. As a result,

05 petitioner has failed to provide a sufficient justification for his filing delay to entitle him to

06 statutory tolling based upon unique facts pertaining to his case, or make the requisite showing

07 of diligence and extraordinary circumstances necessary to warrant equitable tolling.

08      In sum, petitioner has failed to demonstrate a right to statutory or equitable tolling of

09 the statute of limitations during petitioner's unreasonable 155-day delay between the denial of

10 State Petition #1 and the filing of State Petition #2. As a result, the intervals which are to be

11 counted against the one-year limitation in AEDPA include:

12      • 262 days prior to the filing of State Petition #1;

13      • 155 days between the denial of State Petition #1 and the filing of State Petition
14        #2; and

15      • 61 days between the denial of State Petition #3 and the filing of this federal
         petition.

16 The total of 478 days renders petitioner's federal habeas petition untimely.

17      This finding provides a fully sufficient basis for this Court to deny this federal

18 petition. But even if this Court permits petitioner to make a belated showing that his federal

19 habeas petition was timely, and if petitioner succeeds in so showing, his federal petition must

20 nevertheless fail on the merits, for the reasons discussed below.

21

22

## III.    BACKGROUND

On February 3, 1981, petitioner was drinking at a local tavern with another man, Reed Smith, when they met the victim, Rudy Damian. (*See* Dkt. 12, Ex. C at 12.) The victim, who was already intoxicated, purchased drinks for petitioner and Smith, and offered to get drugs for them. (*See id*. at 14.) The three men left the bar in petitioner's truck, stopping at several locations to buy beer and gasoline, and to attempt to locate drugs. (*See id*.) As the evening wore on, and the men's efforts to obtain drugs were unsuccessful, the victim's behavior began to annoy petitioner. (*See id*.) After the three men drove to a remote location to drink beer, the victim made a comment that petitioner perceived as a homosexual overture. (*See id*.) Petitioner and Smith responded by hitting and kicking the victim until it appeared he would no longer survive. (*See id*.) Petitioner then obtained a knife from Smith and repeatedly stabbed the victim, who was either unconscious or already dead. (*See id*. at 14-15.) After tying a belt around the victim's neck to drag the body off the road to a different location, petitioner and his accomplice left the scene to purchase more beer. (*See id*. at 15.)

On September 16, 1981, petitioner pled guilty in Contra Costa County Superior Court to second degree murder with a weapons enhancement, and was sentenced to sixteen-years-to-life with the possibility of parole. (*See* Dkt. 1 at 3.) He did not appeal the judgment of conviction. Petitioner began serving his prison term on October 26, 1981, when petitioner was twenty-two years old. (*See id*.) His minimum eligible parole date was set for January 19, 1990. (*See id*.)

Petitioner's eighth consecutive and ninth overall parole consideration hearing was held on November 1, 2004, and the Board found petitioner suitable for release on parole. (*See* Dkt.

01    12, Ex. C at 84.)  The Board's decision became final on March 1, 2005.  (*See id*. at 95.)  On

02    March 22, 2005, however, the Governor exercised his authority pursuant to Article V, Section

03    8, Subdivision (b) of the California Constitution to reverse the Board's decision.  (*See id*., Ex.

04    D at 3.)  *See also* Cal. Penal Code § 3041.2.  At the time of the Governor's denial, petitioner

05    was forty-six-years-old, and had been in custody for approximately twenty-four years.

06    Petitioner contends his 2005 denial by the Governor violated his Fifth and Fourteenth

07    Amendment Due Process rights.  Thus, petitioner does not challenge the validity of his

08    conviction, but instead challenges the Governor's 2005 decision finding him unsuitable for

09    parole.

10          IV.    STANDARD OF REVIEW

11          AEDPA governs this petition because it was filed after the statute's enactment.  *See*

12    *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Because petitioner is in custody of the

13    California Department of Corrections pursuant to a state court judgment, 28 U.S.C. § 2254

14    provides the exclusive vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002,

15    1009-10 (9th Cir. 2004) (providing that § 2254 is "the exclusive vehicle for a habeas petition

16    by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is

17    not challenging his underlying state court conviction.").  Under AEDPA, a habeas petition

18    may not be granted with respect to any claim adjudicated on the merits in state court unless

19    petitioner demonstrates that the highest state court decision rejecting his petition was either

20    "contrary to, or involved an unreasonable application of, clearly established Federal law" as

21    determined by the U.S. Supreme Court, or "based on an unreasonable determination of the

22    facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

01        As a threshold matter, this Court must ascertain whether relevant federal law was

02  "clearly established" at the time of the state court's decision.  To make this determination, the

03  Court may only consider the holdings, as opposed to dicta, of the United States Supreme

04  Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

05  precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

06  331 F.3d 1062, 1069 (9th Cir. 2003).

07        The Court must then determine whether the state court's decision was "contrary to, or

08  involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

09  *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

10  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

11  Supreme] Court on a question of law or if the state court decides a case differently than [the]

12  Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

13  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

14  state court identifies the correct governing legal principle from [the] Court's decisions but

15  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

16  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

17  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

18  established federal law erroneously or incorrectly.  Rather that application must also be

19  [objectively] unreasonable."  *Id.* at 411.

20        Furthermore, in each case the petitioner has the burden of establishing that the state

21  court decision was contrary to, or involved an unreasonable application of, clearly established

22  federal law.  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To

01 determine whether the petitioner has met this burden, a federal habeas court looks to the last

02 reasoned state court decision because subsequent unexplained orders upholding that judgment

03 are presumed to rest upon the same ground. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

04 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

05        Finally, AEDPA requires federal courts to give considerable deference to state court

06 decisions, and state courts' factual findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1).

07 Federal courts are also bound by a state's interpretation of its own laws. *See Murtishaw v.*

08 *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

09 (9th Cir. 1993)).

10        V.     FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

11        A.     *Due Process Right to be Released on Parole*

12        Under the Fifth and Fourteenth Amendments to the U.S. Constitution, the government

13 is prohibited from depriving an inmate of life, liberty or property without the due process of

14 law. U.S. Const. amends. V, XIV. A prisoner's due process claim must be analyzed in two

15 steps: the first asks whether the state has interfered with a constitutionally protected liberty or

16 property interest of the prisoner, and the second asks whether the procedures accompanying

17 that interference were constitutionally sufficient. *Ky. Dep't of Corrs. v. Thompson*, 490 U.S.

18 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).

19        Accordingly, our first inquiry is whether petitioner has a constitutionally protected

20 liberty interest in parole. The Supreme Court articulated the governing rule in this area in

21 *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

22 U.S. 369 (1987). *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

"the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme). The Court in *Greenholtz* determined that although there is no constitutional right to be conditionally released on parole, if a state's statutory scheme employs mandatory language that creates a presumption that parole release will be granted if certain designated findings are made, the statute gives rise to a constitutional liberty interest. *See Greenholtz*, 442 U.S. at 7, 12; *Allen*, 482 U.S. at 377-78.

As discussed *infra*, California statutes and regulations afford a prisoner serving an indeterminate life sentence an expectation of parole unless, in the judgment of the parole authority, he "will pose an unreasonable risk of danger to society if released from prison." Title 15 Cal. Code Regs., § 2402(a). The Ninth Circuit has therefore held that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*, 306 F.3d at 902. To similar effect, *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007), held that California Penal Code § 3041 vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." This "liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003). *See also Sass*, 461 F.3d at 1127.

Because the denial of parole interfered with petitioner's constitutionally-protected liberty interest, this Court must proceed to the second step in the procedural due process analysis and determine whether the procedures accompanying that interference were constitutionally sufficient. "[T]he Supreme Court [has] clearly established that a parole

01 board's decision deprives a prisoner of due process with respect to this interest if the board's

02 decision is not supported by 'some evidence in the record.'" *Irons*, 505 F.3d at 851 (citing

03 *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

04 applies in prison disciplinary proceedings)). The "some evidence" standard requires this

05 Court to determine "whether there is any evidence in the record that could support the

06 conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56. Although *Hill*

07 involved the accumulation of good time credits rather than release on parole, later cases have

08 held that the same constitutional principles apply in the parole context because both situations

09 directly affect the duration of the prison term. *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

10 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

11 Court in *Hill* in the parole context); *accord*, *Sass*, 461 F.3d at 1128-29; *Biggs*, 334 F.3d at

12 915; *McQuillion*, 306 F.3d at 904.

13 "The fundamental fairness guaranteed by the Due Process Clause does not require

14 courts to set aside decisions of prison administrators that have some basis in fact," however.

15 *Hill*, 472 U.S. at 456. Similarly, the "some evidence" standard is not an invitation to examine

16 the entire record, independently assess witnesses' credibility, or re-weigh the evidence. *Id.* at

17 455. Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

18 *See id.* at 454. The Court in *Hill* added an exclamation point to the limited scope of federal

19 habeas review when it upheld the finding of the prison administrators despite the Court's

20 characterization of the supporting evidence as "meager." *See id.* at 457.

21

22

01          B.      *California's Statutory and Regulatory Scheme*

02          In order to determine whether "some evidence" supported the Governor's decision

03   with respect to petitioner, this Court must consider the California statutes and regulations that

04   govern the Board and Governor's decision-making.  *See Biggs*, 334 F.3d at 915.  Under

05   California law, the Board is authorized to set release dates and grant parole for inmates with

06   indeterminate sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq*.  Section 3041(a)

07   requires the Board to meet with each inmate one year before the expiration of his minimum

08   sentence and normally set a release date in a manner that will provide uniform terms for

09   offenses of similar gravity and magnitude with respect to their threat to the public, as well as

10   comply with applicable sentencing rules.  Subsection (b) of this section requires that the

11   Board set a release date "unless it determines that the gravity of current convicted offense or

12   offenses, or the timing and gravity of current or past convicted offense or offenses, is such

13   that consideration of the public safety requires a more lengthy period of incarceration." *Id.*,

14   § 3041(b).  Pursuant to the mandate of § 3041(a), the Board must "establish criteria for the

15   setting of parole release dates" which take into account the number of victims of the offense

16   as well as other factors in mitigation or aggravation of the crime.  The Board has therefore

17   promulgated regulations setting forth the guidelines it must follow when determining parole

18   suitability.  *See* 15 CCR § 2402, *et seq*.

19          Accordingly, the Board is guided by the following regulations in making a

20   determination whether a prisoner is suitable for parole:

21                      (a) General. The panel shall first determine whether the life
                        prisoner is suitable for release on parole. Regardless of the
22                      length of time served, a life prisoner shall be found unsuitable
                        for and denied parole if in the judgment of the panel the

01     prisoner will pose an unreasonable risk of danger to society if
    released from prison.

02

03     (b) Information Considered. All relevant, reliable information
    available to the panel shall be considered in determining
    suitability for parole. Such information shall include the

04     circumstances of the prisoner's social history; past and present
    mental state; past criminal history, including involvement in

05     other criminal misconduct which is reliably documented; the
    base and other commitment offenses, including behavior before,

06     during and after the crime; past and present attitude toward the
    crime; any conditions of treatment or control, including the use

07     of special conditions under which the prisoner may safely be
    released to the community; and any other information which

08     bears on the prisoner's suitability for release. Circumstances
    which taken alone may not firmly establish unsuitability for

09     parole may contribute to a pattern which results in a finding of
    unsuitability.

10

11 15 CCR § 2402(a) and (b). Subsections (c) and (d) also set forth suitability and unsuitability

12 factors to further assist the Board in analyzing whether an inmate should be granted parole,

13 although "the importance attached to any circumstance or combination of circumstances in a

14 particular case is left to the judgment of the panel." 15 CCR § 2402(c).

15        Under the California Constitution, any parole decision made by the Board regarding

16 prisoners sentenced to indeterminate sentences based upon a conviction of murder is subject

17 to review by the Governor within thirty days. *See* Cal. Const. Art. V § 8(b). Although the

18 Governor may only affirm, modify, or reverse the Board's decision based upon the same

19 factors which the Board is required to consider, the Governor undertakes an independent, *de*

20 *novo* review of the inmate's suitability for parole. *See In re Lawrence*, 44 Cal.4th 1181, 1204

21 (2008). The Governor therefore has discretion to be more stringent or cautious than the Board

22 in determining whether a prisoner poses an unreasonable risk to public safety. *See id.* If the

01 Governor decides to reverse or modify the Board's decision, he or she must "send a written

02 statement to the inmate specifying the reasons for his or her decision." 15 CCR § 3041.2(b).

03       In examining its own statutory and regulatory framework, the California Supreme

04 Court in *In re Lawrence* recently held that the proper inquiry for a court reviewing a parole

05 decision by the Board or Governor is "whether some evidence supports the *decision* of the

06 Board or the Governor that the inmate constitutes a current threat to public safety, and not

07 merely whether some evidence confirms the existence of certain factual findings." *Lawrence*,

08 44 Cal.4th at 1212. The court also asserted that the decision must demonstrate "an

09 individualized consideration of the specified criteria, but "[i]t is not the existence or

10 nonexistence of suitability or unsuitability factors that forms the crux of the parole decision;

11 the significant circumstance is how those factors interrelate to support a conclusion of current

12 dangerousness to the public." *Id*. at 1204-05, 1212. Furthermore, "although the Board and

13 the Governor may rely upon the aggravated circumstances of the commitment offense as a

14 basis for a decision denying parole, the aggravated nature of the crime does not in and of itself

15 provide some evidence of *current* dangerousness to the public unless the record also

16 establishes that something in the prisoner's pre- or post-incarceration history, or his or her

17 current demeanor and mental state, indicates that the implications regarding the prisoner's

18 dangerousness that derive from his or her commission of the commitment offense remain

19 probative to the statutory determination of a continuing threat to public safety." *Id*. at 1214.

20       Finally, as long as the evidence underlying the decision has "some indicia of

21 reliability," parole has not been arbitrarily denied. *See Jancsek*, 833 F.2d at 1390. As the

22 California courts have continually noted, the discretion of the Board and Governor in parole

01 release matters is very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code,

02 corresponding regulations, and California law clearly establish that the fundamental

03 consideration in parole decisions is public safety and an assessment of a prisoner's current

04 dangerousness.  *See id.* at 1205-06.

05       C.    *Summary of Governing Principles*

06       By virtue of California law, petitioner has a constitutional liberty interest in release on

07 parole.  The parole authorities, in this case, the Governor, may decline to set a parole date

08 only upon a finding that petitioner's release would present an unreasonable present risk of

09 danger to society if he is released from prison.  Where the parole authorities deny release,

10 based upon an adverse finding on that issue, the role of a federal habeas court is narrowly

11 limited.  It must deny relief if there is "some evidence" in the record to support the parole

12 authority's finding of present dangerousness.  The penal code, corresponding regulations, and

13 California law clearly support the foregoing interpretation.

14     VI.     PARTIES' CONTENTIONS

15       Petitioner contends that the Governor violated his state and federal due process rights

16 by finding him unsuitable for parole without any evidence that he poses an unreasonable risk

17 of danger to society if released from prison.[3]  (*See* Dkt. 1 at 10.)  Specifically, petitioner

18 claims that the Governor found him unsuitable based upon the immutable facts of the

19 commitment offense, as well as petitioner's "non-violent, non-recent prison conduct record."

20 (*See id*. at 10 and 12.)  In addition, petitioner contends that the Governor failed to afford him

21 _____

22     [3] We do not reach petitioner's claim that his state due process rights were violated, as state claims are not cognizable in a federal habeas petition.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

01  an individualized consideration of all relevant suitability factors, such as the significant stress

02  caused by an incident prior to the date of petitioner's commitment offense.  Petitioner claims

03  that in that incident, he was the victim of a sexual assault inflicted by three men armed with a

04  knife.  (*See id*. at 11.)  *See also* 15 CCR § 2404(d)(4).  Thus, petitioner does not challenge the

05  validity of his conviction, but instead challenges the Governor's 2005 decision finding him

06  unsuitable for parole.

07      Respondent argues that petitioner does not have a constitutionally protected liberty

08  interest in being released on parole, and that the "some evidence" standard is inapplicable in

09  this context.  (*See* Dkt. 12 at 10-16.)  Even if petitioner does have a protected liberty interest,

10  respondent contends that the Governor adequately predicated his denial of parole on "some

11  evidence" that petitioner was currently dangerous.  (*See id*.)  Accordingly, respondent asserts

12  that petitioner's due process rights were not violated by the Governor's 2005 decision.

13      VII.    ANALYSIS OF RECORD IN THIS CASE

14          A.    *Petitioner's Due Process Claim*

15      In his decision reversing the Board's grant of parole, the Governor primarily relied

16  upon the circumstances of petitioner's commitment offense to deny parole, but also cited

17  petitioner's previous record of violence, criminal history, and recent disciplinary record in

18  prison as evidence that petitioner continued to pose an unreasonable risk of danger to society.

19  (*See id*., Ex. D at 1-3.)  The Governor's findings tracked the applicable unsuitability and

20  suitability factors listed in § 2402(b), (c), and (d) of Chapter 15 of the California Code of

21  Regulations.  *See also Lawrence*, 44 Cal.4th at 1214 (holding that "the aggravated nature of

22  the crime does not in and of itself provide some evidence of *current* dangerousness to the

01  public unless the record also establishes that something in the prisoner's pre- or post-

02  incarceration history, or his or her current demeanor and mental state, indicates that the

03  implications regarding the prisoner's dangerousness that derive from his or her commission of

04  the commitment offense remain probative to the statutory determination of a continuing threat

05  to public safety.")  After considering all reliable evidence in the record, the Governor

06  concluded that evidence of petitioner's positive behavior in prison did not outweigh evidence

07  of his unsuitability for parole.  (*See* Dkt. 12, Ex. D at 3.)

08          With respect to the circumstances of the commitment offense, the Governor found that

09  the murder was carried out in an "especially heinous" manner.  (*See id*. at 3.)  *See also* 15

10  CCR § 2402(c)(1).  Specifically, the Governor asserted that petitioner "stabbed Mr. Damian

11  27 times, according to the autopsy report, and he did so after he and his crime partner had

12  already hit and kicked this man - making the second-degree murder for which he was

13  convicted especially grave."  (*See* Dkt. 12, Ex. D at 3.)  Furthermore, the Governor noted that

14  after the beating, which was so severe it appeared the victim would not survive, petitioner

15  chose not to comply with his crime partner's request to leave the scene, but instead began

16  stabbing the victim.  (*See id*.)  The Governor characterized the murder as a "senseless and

17  ruthless attack upon . . . an especially vulnerable victim given that he was impaired and

18  outnumbered."  (*Id*.)  As mentioned above, although he stated that "the gravity of this murder

19  committed by [petitioner] is alone a sufficient basis for me to conclude at this time that his

20  release from prison would pose an unreasonable public-safety risk," the Governor also

21  identified additional evidence of current dangerousness in petitioner's pre- and post-

22  incarceration history that supported his finding that petitioner was unsuitable for parole.  (*Id*.

01 at 1-3.) *See also Lawrence*, 44 Cal.4th at 1214.

02       Specifically, in addition to the commitment offense, the Governor relied upon

03 petitioner's previous record of violence as a basis for denying parole. In particular, the

04 Governor emphasized petitioner's "documented history of inappropriately managing his

05 anger," a life-long problem which resulted in the commitment offense because "Mr. Reid told

06 a mental health evaluator in 2000 that rage is what prompted him to murder the victim." (Dkt.

07 12, Ex. D at 2.) A prisoner's previous record of violence is a factor tending to indicate

08 unsuitability for parole if a prisoner "inflicted or attempted to inflict serious injury on a

09 victim, particularly if the victim demonstrated serious assaultive behavior at an early age."

10 *See* 15 CCR § 2402(c)(2). The Governor's findings with respect to this factor were amply

11 supported by the record.

12       For example, the probation officer's report notes that petitioner's "violent tendencies"

13 were first identified at a very early age, when "his parents sought professional help for his bad

14 temper. . . ." (Dkt . 12, Ex. B at 20.) Petitioner met with a counselor for a period of time in

15 the seventh or eighth grade, but admitted that the treatment did not work and "he really did

16 not get a lot out of these counseling sessions." (*Id*. at 16.) Petitioner was also arrested

17 "roughly three years [prior to the commitment offense] for battery on a police officer,

18 mayhem, and resisting arrest" in an incident that was cited in the Governor's decision. (*Id*.,

19 Ex. D at 1; *see id*., Ex. C at 24-26.) Specifically, that incident arose from a police officer's

20 investigation of a tailgating incident at petitioner's home. (*See id*., Ex. D at 1.) When the

21 officer mistakenly referred to petitioner's wife as his mother, petitioner "pushed the officer in

22 the chest, knocking him backwards. After another officer arrived to the scene, [petitioner]

01  tried to throw punches and kick the officers, and ultimately bit one of them." (*Id.*) Although

02  these charges were ultimately dismissed when petitioner pled guilty to the underlying murder

03  conviction, the petitioner's conduct demonstrated a pattern of angry and violent behaviour

04  that began at a young age and continued up until the commitment offense.

05    The third factor relied upon by the Governor was petitioner's prior criminal history.

06  (*See id.* at 1.) The applicable guidelines provide that the parole authorities must consider "a

07  prisoner's past criminal history, including involvement in other criminal misconduct which is

08  reliably documented." *See* 15 CCR § 2402(b). The Governor observed that petitioner was

09  "an admitted alcoholic and drug user, and no stranger to contacts with law enforcement" at

10  the time of the commitment offense. In addition to petitioner's arrest, the Governor cited

11  petitioner's "seven other convictions" for traffic offenses, including three convictions for

12  driving under the influence and four convictions for driving on a suspended license. (*See* Dkt.

13  12, Ex. C at 24; *id.*, Ex. D at 1.) Although petitioner's history of drug and alcohol abuse and

14  his seven traffic convictions, without more, may not constitute "some evidence" that

15  petitioner remained currently dangerous at the time of the Governor's decision, his criminal

16  history does support the Governor's finding that petitioner has "consistently demonstrated

17  disregard for – and an unwillingness or inability to curb his behaviour to – the rules of his

18  environment." (*See id.*, Ex. D at 2.)

19    The fourth factor relied upon by the Governor was petitioner's disciplinary record in

20  prison, which also reflects petitioner's history of inappropriately managing his anger. (*See id.*

21  at 1-2.) *See also* 15 CCR § 2402(c)(6) (providing that a prisoner's negative "institutional

22  behavior," such as "serious misconduct in prison or jail" constitutes a factor tending to

01 indicate unsuitability for parole).  The disciplinary record of a California prisoner is

02 chronicled in the report forms placed in the prisoner's "Central File."  When a prisoner's

03 "misconduct is believed to be a violation of law or is not minor in nature, it shall be reported

04 on a CDC Form 115 (Rev.7/88), Rules Violation Report," or a "CDC 115."  15 CCR

05 § 3312(a)(3).  In contrast, when "minor misconduct recurs after verbal counseling or if

06 documentation of minor misconduct is needed, a description of the misconduct and

07 counseling provided shall be documented on a CDC Form 128-A, Custodial Counseling

08 Chrono," or a "CDC 128A."  15 CCR § 3312(a)(2).

09     The Governor noted that during petitioner's incarceration, he has received seven CDC

10 115s for non-minor prison-rules violations, at least two of which "involved disrespectful or

11 assaultive conduct" toward correctional officers.[4]  (*See* Dkt. 12, Ex. D at 1; *id.*, Ex. G at 71;

12 Dkt. 1, Ex. 40 at 2; Dkt. 21, Exs. 1 and 2.)  Specifically, petitioner was disciplined for making

13 a racial comment to a correctional officer in September 1988, and for exhibiting aggressive

14 and threatening behavior toward a correctional officer in May 1994.  (*See* Dkt. 12, Ex. D at 1;

15 *id.*, Ex. C at 33-34; Dkt. 21, Exs. 1 and 2.)  Similarly, the Governor observed that when

16 petitioner was disciplined for not following count procedures and possession of unissued

17 property in 1985 and 1989, respectively, the correctional officers reported that petitioner "on

18 both occasions, used profane and/or threatening language in response to their efforts to

19

20     [4] Petitioner "admits that he received rules violation reports and counseling chronos . . . to the
extent of his admissions reflected in the reports."  (*See* Dkt. 22 at 2.)  He also "admits the Governor
21 properly considered petitioner's rules violation reports and counseling chronos in their entirety in
reviewing petitioner's parole grant."  (*Id.*)  Petitioner's sole contention concerning his disciplinary
22 history is that his rules violations in prison were "not probative of petitioner's dangerousness at the
time the Governor conducted his review. . . ." (*Id.*)  As discussed below, petitioner's contention is
unavailing.

counsel him." (Dkt. 12, Ex. D at 2; Dkt. 21, Exs. 3 and 4.)

Moreover, petitioner has received seven 128As for minor misconduct during his incarceration. (*See* Dkt. 12, Ex. D at 2; *id.*, Ex. C at 34; *id.*, Ex. G at 26, 32, 45, and 55; Dkt. 21, Ex. 5.) During one such incident in 1997, a correctional officer reported that petitioner became "belligerent, with an intimidating attitude" when he was counseled about the "No Dorm Visiting Policy." (*See* Dkt. 21, Ex. 5 at 1.)

Petitioner committed his most recent disciplinary violation in September 2003, only one year before his parole hearing and two years before the Governor's decision. (*See* Dkt. 12, Ex. C at 33-36 and 73-74.) Although the Governor acknowledged that the violation appeared "less-than serious" because it involved petitioner's possession of a one-dollar bill from his recently deceased grandfather that had been glued into a book to keep for sentimental reasons, the incident still constituted a knowing and deliberate rule violation. (*See id.*, Ex. D at 2.) The Governor could reasonably consider the 2003 violation, and then conclude that petitioner's recent behavioral improvement in prison during "the last two years is not enough to outweigh the 20 years he consistently demonstrated disregard for – and an unwillingness or inability to curb his behavior to – the rules of his environment." (*Id.* at 2.) Accordingly, petitioner's aggravated commitment offense, previous record of violence, prior criminal history, and disciplinary record in prison provide "some evidence" to support the Governor's conclusion that petitioner would pose a current public safety risk if released on parole.

Contrary to petitioner's argument that the Governor failed to consider or give appropriate weight to the parole suitability rules which favored petitioner, the Governor acknowledged that petitioner has expressed remorse for his crime, maintained solid

relationships with family and friends throughout his confinement, confirmed suitable parole plans for his release, upgraded vocationally by availing himself of training in masonry and electronics in prison, and held a variety of skilled institutional jobs. (*Id*.) *See also* 15 CCR § 2402(d)(2), (3), (8), and (9). He observed that petitioner has consistently participated in self-help and therapy programs, including Alcoholics Anonymous and Narcotics Anonymous since 1984, Breaking Barriers, Victim Offender Reconciliation, Prison Outreach, and one-on-one psychotherapy programs. (*See* Dkt. 12, Ex. D at 2.) In addition, the Governor noted that petitioner's most recent mental-health evaluation in 2003 assessed his risk of future dangerousness as "significantly lower than the average inmate." (*Id*.)

Petitioner's contention that the Governor failed to acknowledge that petitioner was motivated to commit this murder by the significant stress he suffered as a result of a prior sexual assault inflicted upon petitioner by three men armed with a knife is similarly unavailing. (*See* Dkt. 1 at 11.) *See also* 15 CCR § 2404(d)(4) (providing that "significant stress" in a prisoner's life which motivated him to commit the offense is a factor tending to indicate suitability for parole). The Governor did acknowledge petitioner's motivation for the crime when he stated, "At some point, Mr. Damian made a comment that [petitioner] interpreted as a homosexual overture to him. [Petitioner] and his crime partner then hit and kicked Mr. Damian." (Dkt. 12, Ex. D at 1.) Furthermore, the Governor's failure to discuss petitioner's allegations concerning an unreported, prior sexual assault in detail was not improper, as he has broad discretion to determine how suitability and unsuitability factors interrelate to support his conclusion of current dangerousness to the public. *See Lawrence*, 44 Cal.4th at 1212.

01          Accordingly, it is an inaccurate characterization of the record to say that the Governor

02    failed to consider evidence that favored petitioner, or found him unsuitable for parole without

03    evidence of current dangerousness.  (*See* Dkt. 1 at 10 and 12.)  Petitioner's argument that the

04    Governor's decision ran afoul of the governing regulations is unconvincing.  Despite

05    petitioner's recent progress, the Governor determined that petitioner would currently present a

06    public safety risk if released on parole.  (*See* Dkt. 12, Ex. D at 3.)

07          B.    *Contra Costa County Superior Court Decision*

08          Petitioner's habeas petitions filed in the California Court of Appeal and California

09    Supreme Court contained the same claims as his Contra Costa County Superior Court

10    petition, and both appellate petitions were summarily denied.  (*See id*., Exs. E, F, and G.)

11    Accordingly, this Court reviews the Contra Costa County Superior Court's Order upholding

12    the Governor's decision to determine whether it meets the deferential AEDPA standards, as it

13    was the last reasoned state court decision.  *See Ylst*, 501 U.S. at 803-04.

14          In its decision denying petitioner's request for habeas relief, the superior court asserted

15    that based upon its review of the record, "the Governor's decision was supported by the

16    requisite some evidence . . . [and] reflects an individualized consideration of the specified

17    criteria and is neither arbitrary nor capricious."  (Dkt. 12, Ex. E at 5-6.)  Specifically, the

18    superior court concluded that "the record supports the Governor's assessment that the

19    commitment offense was especially heinous . . . Indeed, Petitioner does not seem to dispute

20    that . . . [his] crime *was* especially heinous.  Rather, petitioner complains that the Governor

21    did not consider all relevant reliable factors concerning the commitment offense, specifically

22    that the crime was motivated by a prior sexual assault on Petitioner."  (*Id*. at 5.)  Without

01 expressing an opinion regarding the veracity of petitioner's assertion that he was the victim of

02 a prior sexual assault, the court asserted that it "[did] not believe that petitioner's

03 uncorroborated and post-commitment offense disclosure of an alleged sexual assault

04 constitutes [the kind of] 'reliable' information" the Board or Governor is required to consider

05 under the governing regulations. (*Id.*) *See* 15 CCR 2402(b) (requiring the Board to consider

06 "all relevant, reliable information. . . .").

07       Furthermore, the superior court concluded that petitioner's history of prison-rule

08 violations and inappropriately managing his anger were legitimate considerations for the

09 Governor to weigh in favor of parole denial, especially in light of petitioner's admission that

10 rage had prompted him to kill the victim. (*See* Dkt. 12, Ex. E at 6.) As a result, the state

11 court found that the Governor's decision to reverse the Board's grant of parole was within his

12 broad discretion. Because the Governor's parole denial was supported by "some evidence" of

13 current dangerousness, the superior court's decision was not contrary to, or an unreasonable

14 application of, clearly established federal law.

15       XIII.   CONCLUSION

16       Accordingly, I recommend this Court find that (1) the petition must be denied as

17 untimely under AEDPA; and (2) even if the petition is timely, the petition must fail on the

18 merits because there was "some evidence" that petitioner's release as of the date of the

19 Governor's decision, March 22, 2005, would have presented an unreasonable risk to public

20 safety. As a result, I recommend the Court find that the Contra Costa County Superior

21 Court's Order upholding the Governor's decision was not contrary to, or an unreasonable

22 application of, clearly established federal law. The Court should therefore enter an Order

01  approving and adopting this Report and Recommendation, denying the petition (Dkt. 1), and

02  directing that judgment be entered dismissing this action with prejudice.

03      This Report and Recommendation is submitted to the United States District Judge

04  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty (20)

05  days of being served with this Report and Recommendation, any party may file written

06  objections with this Court and serve a copy on all parties.  Such a document should be

07  captioned "Objections to Magistrate Judge's Report and Recommendation."  Either party may

08  then respond to the other party's objections within fourteen (14) days of being served a copy

09  of such written objections.  Failure to file objections within the specified time may waive the

10  right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A

11  proposed order accompanies this Report and Recommendation.

12      DATED this 16th day of March, 2010.

13

14

15  JOHN L. WEINBERG
    United States Magistrate Judge

16

17

18

19

20

21

22